IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:23-CR-87 |
| | ) | |
| ANTHONY DANIEL BENTON | ) | The Honorable Anthony J. Trenga |
| | ) | |
| Defendant | ) | Sentencing: August 16, 2023 |
| _____ | ) | |

*"It's just between us." – Anthony Benton to a 10-year-old as he tries to entice her to produce*

*child pornography.*

## UNITED STATES' POSITION ON SENTENCING

The United States of America, by and through its undersigned counsel, hereby submits its position on the sentencing of Anthony Daniel Benton ("defendant"). The defendant has pled guilty to one count of production of child pornography, in violation of 18 U.S.C. § 2251(a), and one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2). The applicable guidelines range has been correctly calculated in the Presentence Investigation Report ("PSR") as 360-600 months, constrained by the statutory maximum of 50 years. *See* Dkt. No. 21 (PSR), at Part D, ¶89. For the reasons that follow, the United States respectfully submits that a sentence of 360 months is sufficient but not greater than necessary to effectuate the statutory sentencing factors under 18 U.S.C. § 3553(a). The Court should further impose a lifetime term of supervised release, forfeiture of the electronic devices used in connection with the offense, and restitution and special assessments as set forth by statute and pursuant to the plea agreement.

**I.      Factual Background**

This case is not a simple isolated instance of terrible choices.

In an interview with law enforcement on March 16, 2023, conducted shortly after the search of his residence, Benton admitted to multiple child exploitation offenses spanning over three years. PSR at ¶21. First, he admitted to using Omegle to video chat live with minor females from 2020 to 2023. *Id*. Second, he admitted to purchasing approximately two- undred videos depicting child pornography from a chat application in 2022. *Id*. at ¶28. Third, he admitted that, as an adult, he engaged in sexual intercourse with a 14 or 15-year-old minor in 2021 and again with the same minor in 2022. *Id*. at ¶24.

## Omegle Activity

The defendant began his criminal conduct when he was eighteen years old.  *Id*. at ¶24. In his own words, he used Omegle—the live-streaming application used to commit some of the offense conduct in this case—starting in 2020 to "sext" with roughly 1,000 girls, whose ages ranged from seven (7) or ten (10) to seventeen (17). *Id*. That is to say, the defendant spent the entirety of three years of choosing to find, entice, and secretly record minors engaging in sexually explicit conduct -- three long years exploiting children, while knowing what he was doing was wrong.

On March 17, 2023, forensic review of the defendant's phone revealed seventy-five videos within an app called Keepsafe, many of them depicting child sexual abuse material. *Id* at ¶29. The screen recording further depicted a small preview window of Benton masturbating and the text chat between the minor female and the defendant. *Id*. at ¶30. In some instances, the minors engaged in sexual conduct in addition to displaying their nude buttocks, vagina, and/or breasts. *Id*.  For instance, in a 4 minute, 57 second video labeled [REDACTED]4E47.mov, the defendant engages in a chat with a minor victim who indicates she is 14 years old. *Id*. During the video, the minor victim inserts the handle of what appears to be a women's razor into her vagina.

*Id*. In a 5 minute, 58 second video labeled [REDACTED]:100, a minor girl who appears to be in her teens displays her breast and inserts her finger into her vagina. *Id*. In another video labeled [REDACTED]:100, a minor female who appears to be prepubescent displays her anus and inserts her finger into her vagina. *Id*.

While using Omegle, Benton's culpability is amply demonstrated in the multiple videos he produced in which he encouraged minors to engage in sexually explicit conduct by assuring them that any sexual conduct engaged in by the minors would be "just between us."

| Name | Message[3] |
|------|-----------|
| Minor | Age |
| Benton | 20 |
| Minor | I am 14 |
| Benton | It's okay, just between us |

| Name | Message[1] |
|------|-----------|
| Benton | Can I see your butt |
| Benton | 16 |
| Minor | 13 |
| Benton | It's okay just between me and you |

| Name | Message[2] |
|------|-----------|
| Minor | Are you a boy or girl |
| Benton | Boy |
| Minor | How old are you |
| Benton | 15 |
| Minor | I'm 10 |
| Benton | It's just between us |

In the same interview with law enforcement referenced above, Benton admitted that he got the minors to go along with what he wanted by asking them if they were a girl or boy, asking if they wanted to have fun, by sending a wink face, and through coaching them. *Id* at ¶24. What the defendant declined to mention – but is well established by the evidence – are the great lengths he went through to get minors to engage in sexual conduct. In one instance, excerpted below, he tried for twelve minutes to get a minor to take her clothes off:

---

[1] This is an excerpt from video "[REDACTED]:100".
[2] This is an excerpt from video "[REDACTED]88.MP4".
[3] This is an excerpt from video "[REDACTED]4E471".

| Name | Message[4] |
|---|---|
| Minor | **[A minor victim is seen on the screen wearing cartoon pajamas]** |
| Benton | So can I see ur butt now |
| Benton | Please |
| Benton | I can't see baby |
| Benton | Can you do it again |
| Benton | It's okay |
| Benton | Can I see it again |
| Benton | Please |
| Benton | I'm sorry |
| Benton | Please forgive me |
| Benton | I'm sorry |
| Benton | Yes |
| Benton | Please baby one more time |
| Benton | It will help if you show me baby |
| Benton | Please baby |
| Benton | Spread your cheeks for me |
| Benton | Please |
| Benton | I promise I'll stop asking again if you do it |
| Benton | Please |
| Benton | I'll stop |

---

[4] This is an excerpt from video "[REDACTED]93.MP4".

These repeated, deliberate, and manipulative actions showcase a defendant that knew what he was doing was wrong, exploited children for years anyway, and did not intend to stop.

### Purchase of Child Sexual Abuse Material

The defendant was not satisfied with the hundreds of girls he victimized on Omegle, because he also purchased child pornography from two users on a chat application in 2022. *Id.* at ¶28. He admitted to using his PayPal account in September or October of 2022 to pay $50 or $55 for approximately two hundred videos before doing it again in November of 2022. *Id*. Benton described one of the videos he purchased as depicting an adult male putting his finger inside the vagina of an approximately 8- to 9-year-old female child. *Id*. at ¶22. He further stated that the female child in the video did not have any breast development or pubic hair. *Id*. The defendant also admitted that another video depicted an approximately 8- to 9-year-old female child performing oral intercourse on an adult male. *Id*. He confessed to watching the videos once or twice and masturbating to at least one of them. *Id*. at ¶23. Some of the minors depicted in this material were as young as five years old. *Id.* at ¶24.

While it could be tempting to attribute the defendant's Omegle conduct to his youth or to think of his conduct as not being solely derived from a sexual interest in children, his purchase of hundreds of images of child pornography shatters this illusion. These purchases consisted solely of children being abused and raped:

- One file is a video file approximately two minutes and three seconds in length titled, "[REDACTED]2393." The video depicts a prepubescent female child and an adult male. The child is lying on her back with her legs spread exposing her vagina. An adult male is in front of the child inserting his erect penis into the

child's vagina. The adult male continues to insert his erect penis in and out of the child's vagina. *Id*. at ¶19.

- A second file is a video file approximately eight minutes and fifty seconds in length titled, "[REDACTED]0352." The video depicts a prepubescent female child and an adult male. The child is nude laying on top of a nude adult male with her face near the erect penis of the adult male. The adult male's head is in between the child's legs near her vagina and anus. The child inserts the adult male's erect penis into her mouth. The child continues to insert the adult male's penis into her mouth throughout the duration of the video. The adult male appears to be licking the child's vagina and anus throughout the duration of the video. *Id*.

- A third file is a video file approximately two minutes and twenty-three seconds in length titled, "[REDACTED]2038." The video depicts a prepubescent female child and an adult male. The child is lying on her back with her legs spread exposing her vagina and anus. An adult male is in front of the child inserting his erect penis into the child's anus. The adult male continues to insert his erect penis in and out of the child's anus. *Id*.

The fact that Benton sought out this material, not once, but twice, indicates that he engages in the criminal sexual exploitation of children online not because he himself is a young adult, but rather because has an acute sexual interest in children.

## Sexual Contact with A Minor

The defendant is also not afraid to engage in hands-on contact with minors. Benton admitted to having sexual intercourse with a 14- or 15-year-old female minor in the fall of 2020 in his bedroom when he was nineteen. *Id.* at ¶25. He also admitted to having sexual intercourse

6

with the same female minor in July of 2022 at the female minor's grandparents' house when he was twenty-one and she was either 16- or 17-years-old. *Id*. Although the defendant stated this was consensual, Virginia law sets the age of consent at eighteen, with only a close-in age three-year exception for other individuals under the age of eighteen. *See* Virginia Criminal Code § 18.2-63. The defendant was not only nineteen at the time this occurred, but he was as much as five years older than the minor female.

On March 23, 2023, the defendant was charged by complaint with sexual exploitation of children, in violation of 18 U.S.C. § 2251(a).  *See* Dkt. Nos. 1 (Complaint), 2 (Affidavit).  On May 12, 2023, the defendant entered a plea of guilty to an information charging him with one count of sexual exploitation of children and one count of receipt of child pornography from between on or about 2020, through on or about March 14, 2023.  *See* Dkt. Nos. 12 (Plea Agreement), 20 (Statement of Facts).

## II.   STATUTORY PENALTIES AND GUIDELINES CALCULATIONS

Production of child pornography carries a minimum term of 15 years' imprisonment with a maximum term of 30 years' imprisonment.  *See* 18 U.S.C. § 2251(a) and (e).  Receipt of child pornography carries a minimum term of 5 years' imprisonment with a maximum term of 20 years' imprisonment. See 18 U.S.C. § 2252(a)(2) and (b).  Following any term of imprisonment, the defendant must be placed on supervised release for a term of at least five years up to life.  *See* 18 U.S.C. § 3583(k).

As the Court is aware, although the Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing."  *United States v. Booker*, 543 U.S. 220, 264 (2005).  Thus, at sentencing, a court "must first calculate the Guidelines range" applicable to the defendant.  *Nelson v. United States*, 555 U.S. 350, 351

(2009); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Here, the PSR correctly

calculated the total offense level for the defendant under the Guidelines as follows:

| Guideline | |
|---|---|
| Base offense level because the defendant was convicted of 18 U.S.C. § 2252(a)(2) (U.S.S.G. § 2G2.2) | 22 |
| The material involved a prepubescent minor or a minor who had not attained the age of 12 years (USSG §2G2.2(b)(2)) | +2 |
| The offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence, or (B) sexual abuse or exploitation of an infant or toddler. (USSG §2G2.2(b)(4)) | +4 |
| The defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor. (USSG §2G2.2(b)(5)) | +5 |
| For the purpose of producing sexually explicit material, the offense involved the use of a computer or an interactive computer service to (i) persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in sexually explicit conduct (U.S.S.G. § 2G2.1(b)(6)(B)) | +2 |
| The offense involved 600 or more images. USSG §2G2.2(b)(7)(D) | +5 |
| | 40 |

| Adjusted Offense Levels | 40 |
|---|---|
| The offense of conviction is a covered sex crime, neither §4B1.1 (Career Offender) nor subsection (a) of §4B1.5 applies and the defendant engaged in a pattern of activity involving prohibited sexual conduct. Therefore, the defendant is a repeat and dangerous sex offender against minors. (USSG §4B1.5(b)(1)) | +5 |
| **TOTAL OFFENSE LEVEL** | **45** |

PSR at ¶¶ 57—85.

The defendant has demonstrated acceptance of responsibility for this offense and is therefore entitled to a two-level decrease in offense level under U.S.S.G. § 3E1.1(a).  *Id.* at ¶ 60. This two-level decrease is correctly reflected in the PSR.  Moreover, the defendant has assisted authorities in the prosecution of his own misconduct by timely notifying the government of his intention to enter a plea of guilty.  Accordingly, the government moves for an additional one-level decrease in the offense level pursuant to U.S.S.G. § 3E1.1(b) and the plea agreement.  *Id.* at ¶ 61.  The defendant's criminal history score is zero, resulting in a Criminal History Category I. *Id.* at ¶ 65.  Based on a total offense level of 42 and a Criminal History Category I, the defendant's Guidelines sentencing range is 360-600 months, constrained by the statutory maximum of 50 years.  *Id.* at ¶ 89.  Neither the government nor the defendant has submitted any objection to this calculation.

## III.    SECTION 3553(a) FACTORS

After calculating the Guidelines range, a sentencing court must then consider that range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant.  *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  As explained below, consideration of these factors suggests that a 360-month sentence is appropriate in this case.

A. **The nature, circumstances, and seriousness of the defendant's offense**

Child pornography offenses are extraordinarily serious offenses, and certainly are not victimless crimes.  As the Supreme Court has recognized, all child pornography crimes "produce[] concrete and devastating harms for real, identifiable victims." *Paroline v. United States*, 572 U.S. 434, 457 (2014).  "It is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography. Such images are 'a permanent record of the children's participation . . . .'"  *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *Ferber*, 458 U.S. at 759); *accord United States v. Accardi*, 669 F.3d 340, 345 (D.C. Cir. 2012) ("[C]hild pornography creates an indelible record of the children's participation in a traumatizing activity . . . .").  "Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *accord United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters").

As described above, the defendant has shown a specific sexual interest in children by paying for over two hundred images of child sexual abuse material within a three-month span. There was no mistaking what he was buying either, as the seller on the chat application sent a collage of all the child sexual abuse material to Benton before purchase. *See* Gov. Exhibit 1 at 16. Benton bought this material all while himself producing seventy-five videos of new child sexual abuse material.  In his own words, "Once I started it, I couldn't stop myself." *Id*. at 10. It

is important to pause on that number: seventy-five separate videos, reflecting the exploitation of seventy-five victims, each a child subjected to the experience of Benton begging them to show their butt and vagina and/or showing them his erect penis, and that were recorded in what the victims thought was a private moment.

There are only two reasons that the number of child sexual abuse videos were not higher. First, some of the children, including a 10-year-old, did not give in to his prolonged, repeated, enticements to take off their clothes. Second, Benton himself did not record all the encounters he had:

| |
|---|
| BENTON: Basically, the same thing I told you, the Omegle stuff. |
| Det. Yung: Three years' worth? |
| BENTON: Roughly. |
| Det. Yung: How often do you go on? |
| BENTON: Every few days. |
| Det. Yung: About three or four days a week? |
| BENTON: I would say that, maybe. |
| Det. Yung: About 12 times a month? |
| BENTON: Roughly, maybe less. |
| Det. Yung: 144 times a year multiplied out by three. |
| BENTON: I don't have thousands of videos worth, but like a couple hundred. |
| Det. Yung: So, you recorded about a quarter of it? |
| BENTON: Yeah. |
| SA Bolsei: So, a couple hundred saved? |
| BENTON: Yeah. |

11

| SA Bolsei: A thousand or more than you were involved in that you didn't save? |
|---|
| BENTON: Yeah. |

Gov. Exhibit 1 at 20-21. This indicates that there could be hundreds of additional victims out there, but we simply have no way of locating them.

Finally, the surreptitious nature of Benton's actions adds an additional layer to his crimes. These children did not know that Benton was memorializing their abuse and then retaining and replaying it for his own sexual pleasure. The defendant tricked them into believing he was close to their age by stating that he was as young as fifteen. He then screen-recorded a live-video stream that these children believed would never see the light of day again. Such prolonged, manipulative, and targeted attacks on children warrant a sentence of 360 months of incarceration.

### B.  The history and characteristics of the defendant

The defendant is young and has no criminal history, which is a driving reason for the United States recommending the low end of the guidelines: 360 months. Moreover, Benton was candid and helpful when law enforcement interviewed him on multiple occasions, leading to the prompt resolution of his case. He quickly and clearly accepted responsibility and has limited the number of resources that the justice system expended on his case.  And those factors are appropriately reflected in the Sentencing Guidelines range applicable to Benton, as he has received a three-level reduction in his offense level for acceptance of responsibility, and is accurately placed in Criminal History Category I.

However, the notion that youth or any challenges faced by the defendant in his life are a justification for a departure from the guidelines simply minimizes his own volition. Every individual was young at one point. Every individual faces challenges in life, some more severe, some less severe.  But no age or challenge excuses or mitigates the offenses committed by the

12

defendant.  The victims of his crime—children desperate for attention and affection online—are the ones who experience challenges beyond imagination. Additionally, on balance, the history and characteristics of the defendant make clear that he has lived a stable life with family support and had adequate education and financial resources to live a law-abiding life.  He was not corralled into this crime by a series of unfortunate life circumstances.  Rather, he chose his actions deliberately. His sentence should reflect those facts. Therefore, a low-end guidelines sentence of 360 months' incarceration would therefore reflect both the seriousness of the crime, as well as Benton's history and characteristics.

**C.  The need to promote respect for the law and afford adequate deterrence to criminal conduct**

A sentence of 360 months is sufficient but not greater than necessary to deter the defendant and others from engaging in this conduct in the future.  The need for both specific and general deterrence in this case is critical. The sentence in this case must constitute a loud and clear warning to potential sexual offenders that severe consequences will result from such heinous acts.  Indeed, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'"  *Irey*, 612 F.3d at 1211 (citation omitted). "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'"  *Id*. (citation omitted); accord United States v. Garthus, 652 F.3d 715, 721-22 (7th Cir. 2011); *see also Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing

demand."). Benton and those who think like him need to understand that they risk lengthy prison sentences for this conduct and, perhaps, will decide the risk is too much.

Distressingly, the market for child pornography has continued to grow, and to become more depraved, in recent years. *See, e.g.*, U.S. Sent'g Comm'n Hr'g on the Child Pornography Guidelines 1-2 (Feb. 15, 2012) (statement of James M. Fottrell, Steve DeBrota & Francey Hakes, Dep't of Justice), available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf. That depravity is evident in this case, with the ease of which Benton obtained child sexual abuse material of children as young as five. The need for effective deterrence through a severe sentence here is therefore essential.  The government's recommendation of 360 months accomplishes this goal.

## IV.   SUPERVISED RELEASE

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994).  Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000).   Under 18 U.S.C. § 3583(k), the authorized term of supervised release here is at least five years and up to life.  This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision over time.  *See, e.g.*, Lifetime Consequences for Sex Offenders Act of 2002, H.R. Rep. No. 107–527 at 2 (2002) ("[S]tudies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes [and that] . . . the recidivism rates do not appreciably decline as offenders age"); H.R. Conf. Rep. No. 108-66, at 49–50 (2003) (discussing how amendment to 18 U.S.C. § 3583(k) "responds to the long-standing concerns of

Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders . . . whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison").  Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, *see* U.S.S.G. § 5D1.2(b) (Policy Statement), and the Fourth Circuit has observed that § 3583(k) and 5D1.2(b) jointly "reflect[] the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citations omitted).

Here, the defendant has proven himself dangerous to minors across the United States and the world, admitting that he cannot control his impulses and desire to view child sexual abuse material.  Therefore, the United States believes that it is appropriate to impose a lifetime term of supervised release with the conditions of supervision contemplated under 18 U.S.C. § 3583(d) and U.S.S.G. § 5D1.3(d)(7) for sex offenders required to register under the Sex Offender Registration and Notification Act.

## V.    SPECIAL ASSESSMENTS UNDER THE JVTA & AVAA

The Justice for Victims of Trafficking Act (JVTA) imposes a mandatory assessment of $5,000 on any non-indigent defendant convicted of, among other offenses, distribution of child pornography.[5]  *See* 18 U.S.C. § 3014.  While the statute is silent as to how to determine indigence, courts have treated the imposition of this assessment like the imposition of other post-conviction assessments, where "[t]he defendant bears the burden of proving both his

---

[5] The money obtained from this assessment goes to the Domestic Trafficking Victims' Fund, which awards grants and enhances programming for victims of human trafficking and child pornography.  The § 3014(a) assessment is payable after the defendant has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim compensation.  *See* 18 U.S.C. § 3014(b) & (e).

inability to pay at the time of sentencing and that he is not likely to become able to pay a fine upon his release from his term of imprisonment." *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017) (internal citations and quotation marks omitted). Relevant factors to consider in this determination include a defendant's future earning potential, assets, educational background, employment history, age, and physical condition. *See United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020) ("[W]e agree with our sister circuits that a district court may consider a defendant's future earning potential when determining his ability to pay an assessment under 18 U.S.C. § 3014(a)." (citations omitted)); *see also United States v. Mann*, 770 F. App'x 649, 650 (4th Cir. 2019).

Here, the PSR details the defendant's assets and liabilities and concludes that the defendant appears to be unable to pay fines and the cost of incarceration or supervision. PSR at ¶ 87. However, the defendant is physically capable of working following his term of incarceration. He was employed prior to his incarceration and was making $19.50 per hour. *Id.* ¶ 84. He should be able to redirect those funds to pay a $5,000 special assessment upon his release from imprisonment. *See* 18 U.S.C. § 3613 (noting that the liability to pay a fine or restitution shall terminate the later of 20 years from the entry of judgment or 20 years after the release from imprisonment, whichever is later); *see also United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018). Accordingly, the United States respectfully requests that the Court find the defendant non-indigent and impose the mandatory $5,000 special assessment under 18 U.S.C. § 3014.

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA). The Act instructs that, in addition to any restitution or other special assessment, courts "shall assess not more than $35,000 on any person convicted of . . .

[an] offense for trafficking in child pornography." 18 U.S.C. § 2259A(a)(2). Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* 18 U.S.C. §§ 2259(d), 2259B, and shall be paid in full after any special assessment under 18 U.S.C. § 3013 and any restitution to victims of the defendant's offense, *see* 18 U.S.C. § 2259A(d)(2). In determining the amount to be assessed under 18 U.S.C. § 2259A, courts should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and the guidance in 18 U.S.C. § 3572 for the imposition of fines. *See* 18 U.S.C. § 2259A(c). The United States respectfully requests that the Court impose a reasonable special assessment under 18 U.S.C. § 2259A, in addition to the $100 mandatory special assessment for his felony conviction pursuant to 18 U.S.C. § 3013.

## VI.    RESTITUTION

Pursuant to 18 U.S.C. §§ 2259 and 3663, the defendant must pay restitution in the "full amount of the victims' losses as those losses are defined by Section 2259(c)(2)." PSR at ¶ 12. *See also Paroline v. United States*, 572 U.S. 434, 458 (2014) ("[A] court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."). As part of the plea agreement entered into by the parties, the defendant has agreed that restitution is mandatory under § 2259 and that the Court must enter restitution in an amount not less than $3,000 per victim. *Id.* The defendant has further agreed to restitution for "victims of the conduct described in the charging instrument, Statement of Facts, or *any related or similar conduct*[.]" *Id.* (emphasis added). The defendant has also agreed that the Court may defer the imposition of restitution until after sentencing and to waive the requirement under 18 U.S.C. § 3664(d)(5) that the Court determine a final restitution amount no later than 90 days after sentencing. *Id.*

17

As noted above, the defendant bought over two-hundred images of child sexual abuse material from a chat application.  These have been submitted to NCMEC, but the United States has yet to receive the Child Identification Report and the Victim Identification Report which would identify known victims of child exploitation depicted in the child pornography images produced or received by the defendant (if any). Therefore, the government will request at sentencing that the court set a restitution hearing at a future date to facilitate resolution of any restitution requests.

## VII.   FORFEITURE

The parties will file a consent order of forfeiture at the time of sentencing as contemplated in the plea agreement.  *Id.* at ¶ 13.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court impose a term of 360 months imprisonment, a lifetime of supervised release, a $100 special assessment pursuant to 18 U.S.C. § 3013, a $5,000 special assessment pursuant to 18 U.S.C. § 3014, a reasonable special assessment under 18 U.S.C. § 2259A, and restitution to be agreed upon at a later date.

<div style="margin-left: 40%;">

Respectfully Submitted,

Jessica D. Aber
United States Attorney

By:       _____/s/_____
McKenzie Hightower
Special Assistant United States Attorney (LT)
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Email: mckenzie.hightower@usdoj.gov

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2023, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF")

to counsel of record in this case.


Respectfully submitted,


_____/s/_____
McKenzie Hightower
Special Assistant United States Attorney (LT)
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Email: mckenzie.hightower@usdoj.gov



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT

**GOVERNMENT EXHIBIT 1**

Page 1 of 24

**SYNOPSIS**

**CASE NUMBER**
DC07QR23DC0014

**CASE OPENED**
2/14/2023

**CURRENT CASE TITLE**
Anthony Benton (RGV Referral)

**REPORT TITLE**
Post Polygraph Interview of Anthony BENTON

**REPORTED BY**
Corey Bolsei
SPECIAL AGENT

**APPROVED BY**
Kimberly Honicker
SUPERVISORY SPECIAL AGENT

**DATE APPROVED**
3/27/2023

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

nonelow

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

## DETAILS OF INVESTIGATION

On March 15, 2023, the Honorable John F. Anderson, United States Magistrate Judge for the Eastern District of Virginia, issued federal search and seizure warrants for ███████████ ████, Manassas, VA 20110 (SUBJECT PREMISES); a 2021 Dodge Charger with Virginia Registration 2X-T0NE (SUBJECT VEHICLE); and the person and electronic devices of Anthony BENTON.

On March 15, 2023, at approximately 1845 hours, HSI along with law enforcement officers from the Northern Virginia/Washington D.C. Internet Crimes Against Children (ICAC) Task Force, and Manassas City police department served the above-described search warrants at the SUBJECT PREMISES.  *(Agent's note: service of the above-described search warrants will be documented in a subsequent report.)*

On March 15, 2023, HSI Special Agents (SA) Bolsei and Oliva conducted a consensual interview of BENTON.  During this interview, BENTON consented to participate in a voluntary polygraph interview.  The polygraph interview was conducted at the Prince William County Police Department located at 8900 Freedom Center Boulevard, Manassas, VA 20110.  *(Agent's note: See DC07QR23DC0014.010 for more information on the interview of BENTON.)*

On March 15, 2023, at approximately 2124 hours, BENTON and his sister, ███████████, arrived at the Prince William County Police Department.  United States Secret Service (USSS) SA Williams conducted the voluntary polygraph interview with BENTON.  *(Agent's Note: the polygraph was not audio or video recorded.)*

At approximately 2355 hours, SA Williams and BENTON completed the polygraph interview.  According to SA Williams, BENTON made three disclosures during the post-polygraph interview.  BENTON admitted that, as an adult, he engaged in sexual intercourse with a minor (MV1) in 2021 and again with the same MV1 in 2022.  Additionally, BENTON admitted that he used Omegle to sext approximately 1,000 girls, ages ranged from seven or 10 to 17 years old.  BENTON also viewed pictures and videos from Telegram of girls aged from five to 15 years old.

SA Bolsei requested BENTON to participate in a second interview with SA Bolsei, and BENTON agreed.

On March 16, 2023, at approximately 0007 hours, BENTON entered an interview room located within the Prince William County Police Department (PWC PD).  The interview was audio and video recorded.  The following is a summary of the interview and is not intended to be a verbatim account.  *(Agent's note: see the audio / video recording for a verbatim account of the post polygraph interview with BENTON.)*

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

---

04/10/2023 14:31 EDT

At approximately 0009 hours, SA Bolsei and PWC PD Detective Yung began the interview with BENTON.  SA Bolsei asked BENTON how he was holding up.  BENTON said that he was ok.  SA Bolsei explained that he would like to go over everything that SA Williams shared regarding their interview after the polygraph interview.  SA Bolsei asked BENTON to begin with MV1.

SA Bolsei: Go ahead and fill me in. Let's start with MV1.

BENTON: It was a fling, I saw her around high school. We didn't really start talking until after I graduated. Around 2020.

SA Bolsei: She went to the high school you went to?

BENTON:  Yeah. We basically had intercourse the first time and then we didn't talk about it again after that.

BENTON: We did it again around July of 2022.

SA Bolsei: When was the first time?

BENTON:  I want to say fall of 2020.

SA Bolsei: And then again in July of 2022?

BENTON: Yeah.

Det. Yung: How old was she the first time?

BENTON: She was 15 or 16 and then the second time we did it, we didn't speak again after that.

SA Bolsei: Where did the first time occur?

BENTON: At my house.

SA Bolsei: In your bedroom?

BENTON: Yeah.

SA Bolsei: How about the second time?

BENTON: At her grandparents' house.

SA Bolsei: Where is her house?

---

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

---

04/10/2023 14:31 EDT                                                                    Page 4 of 24

BENTON: I am not quite sure. I honestly don't remember. I probably have it saved in my phone.

SA Bolsei: Is it in Manassas?

BENTON: Yeah, it's around the area.

SA Bolsei: Roughly how far from your house?

BENTON: 20 – 25 minutes.

Det. Yung: Manassas by you or by this area?

BENTON: By me, 15-20 minutes roughly.

SA Bolsei: Do you have the address saved in your phone as a contact?

BENTON: Not in a contact, I typed in one time in the maps. It may have saved.

SA Bolsei: What is her name?

BENTON: MV1 (He spelled out her name).

Det. Yung: You guys went to Osborn?

BENTON: Yeah.

Det. Yung: Was she in high school when you went?

Det. Yung: What would the age gap be?

BENTON: From me and her?

Det. Yung: Yeah.

BENTON: About 4 or 5.

Det. Yung: How old do you think you were the first time?

BENTON: The first time I was 19.

Det. Yung: And she was about?

BENTON: About 15.

---

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT

Det. Yung: And then the second time?

BENTON: 20.

Det. Yung: You say the first time was 19 and that was fall of 2020 and then the summer of 2022?

BENTON: Yeah.

Det. Yung: All consensual?

BENTON: Yeah.

Det. Yung: Did you guys exchange anything else?

BENTON: No, just exchanged snapchat numbers and then met up.

Det. Yung: No pictures?

BENTON: No.

SA Bolsei: Have you had any contact with her since the last time?

BENTON: No.

SA Bolsei: How come?

BENTON: I got into a relationship.

SA Bolsei: This was the only one under 18?

BENTON: That I have had contact with, yes.

Det. Yung: Have there been any non-sexual contact with anyone else under 18, family members, cousins, brothers, sisters? Like changing diapers where you got a feel, potty training, anything like that?

BENTON: With family members, no.

Det. Yung: Could be family, family friends, or anyone under 18.

BENTON: Not that I know of, no.

Det. Yung: Do you understand what nonsexual contact means?

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT                                                                 Page 6 of 24

BENTON: Like flirting.

Det. Yung: Like tickling, going a little too far, brushing the breast or genitals, nothing like that?

BENTON: No.

Det. Yung: What was going through your mind when you had sex with her?

BENTON: I guess at that moment nothing really because it was mutual for both of us. We just did it.

SA Bolsei: Walk us through each time, what lead up to it? How did you regain contact with her after high school?

BENTON: She posted a snap story, and I replied with a heart emoji. And then it went from there, we started talking. Do you want to hang out? Just kept texting each other.

SA Bolsei: Any sexual texting? Nude photos beforehand?

BENTON: She sent a thing on snapchat, it was a sticker of her in her underwear.

SA Bolsei: Just her underwear?

BENTON: She covered herself, but you could see the outline.

SA Bolsei: Did you ever share that image with anyone else?

BENTON: No.

SA Bolsei: Walk us through the first time to the best of your recollection?

BENTON: I picked her up after school. She texted, and I responded, what are you doing. She replied, I am getting ready to leave, do you want to pick me up. I said sure.  I picked her up and went to my house and we finished.

SA Bolsei: Was it planned before you got there?

BENTON: Yeah, because we texted before. Do you want to come to my crib?

SA Bolsei: After the first time why the gap?

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT                                                          Page 7 of 24

BENTON: I don't know how to explain it, we just stopped talking in general until we did it again.

SA Bolsei: Not a bad breakup, she wasn't mad, or you weren't mad?

BENTON: No, we weren't dating, it was like a fling.

Det. Yung: Is she still in school?

BENTON: No, she graduated.

Det. Yung: She is about 17 or 18 now? You're 21 right?

BENTON: Yeah.

Det. Yung: The first time she could have been about 14 or 15?

BENTON: Yeah, yeah, sorry my math was wrong because she was a freshman when I was senior in high school. She would have been 14 turning 15 or 15 already.

SA Bolsei: Do you remember her birthday?

BENTON: No.

SA Bolsei: How did the second one come about?

BENTON: I just texted her to see how she was doing and then we texted that we should make moves. We should talk that night. We texted when I was at Kaiser with my mom and dad. She texted me and asked what I was doing. Light conversation, then she said are you off work tomorrow? I said yes. She said I have a free crib in the morning, do you want to come? I replied, ok sure.

SA Bolsei: Was the text a standard text?

BENTON: It was over snapchat.

SA Bolsei: Do you remember her username?

BENTON: It was her name with the pride flag emoji.

SA Bolsei: The second time was at her grandparents' house?

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



---

04/10/2023 14:31 EDT                                                                                   Page 8 of 24

BENTON: Yeah.

SA Bolsei: Walk me through what happened there.

BENTON: I went in through the back since they were doing construction on the front. I went to her room, and we watched a movie.

SA Bolsei:  Sexual intercourse? Anything else?

BENTON: Just sexual intercourse.

Det. Yung: Both times consensual?

BENTON: Yeah.

Det. Yung: If we talk to her, is she is going to say consensual with no force?

BENTON: No force.

Det. Yung: During this time frame, did you have any issues hooking up with other girls your age? Any reason for this age frame?

BENTON: I didn't really pay attention to the age as much as I should have because I was 17 in my senior year in high school, and she had just turned 14. I didn't really start talking to her until I graduated. We saw each other in high school.

SA Bolsei: After the second time, how come no contact?

BENTON: I was in a relationship.

SA Bolsei: You were in a relationship when this happened?

BENTON: No, I just stopped talking to her.

SA Bolsei: Was she upset?

BENTON: Yes and no, I guess she understood, but was kind of upset.

SA Bolsei: Is MV1 white, black, hispanic?

BENTON: Black.

Det. Yung: Do you know if she is going to college right now?

---

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT                                                                 Page 9 of 24

BENTON: No, she is just working.

Det. Yung: Is she still in the area?

BENTON: Yeah.

Det. Yung: Do you still have her contact info in your phone?

BENTON: Yeah, I have her number.  It's in snapchat.

SA Bolsei: Do you have it saved as a normal contact?

BENTON: Yeah, both.

SA Bolsei: What do you have it saved as?

BENTON: Just MV1.

SA Bolsei: Is that the only one in there?

BENTON: Yeah.

Det. Yung: So, going over what SA Williams said, it seems you have been dabbling with this stuff for the past 3 years?

BENTON: Yeah, I started on Omegle.

Det. Yung: How did that come about?

BENTON: I was bored one day. At first, I was just talking to random people. It just happened, one of the girls I encountered with, she, right off the bat showed her boobs. I showed my thing back and that was really why I was on Omegle. Later down the line, I was talking to a lot of girls.

Det. Yung: What is your preference in a girl's frame?

BENTON: Nice butt, boobs.

Det. Yung: Small boobs, big boobs, no boobs, developing boobs?

BENTON: Small boobs.

Det. Yung: Pubic hair or no pubic hair?

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



---

04/10/2023 14:31 EDT                                                                     Page 10 of 24

BENTON: Either or.

Det. Yung: Smaller or bigger girls?

BENTON: Smaller, sort of big, but not too big.

Det. Yung: How old are you now?

BENTON: 21.

Det. Yung: When did you realize you liked younger girls?

BENTON: I don't like young girls.

Det. Yung: You do, don't be ashamed. It's something right? People we talk to know they like younger girls.

BENTON: I am not ashamed, that's the thing, I would never sexually encounter them. I would never do that, even if I was by myself.

Det. Yung: The thing is, you are on Omegle with them, and you are doing stuff.

BENTON: I know.

Det. Yung: So, you already crossed the line. So, there is something, do you agree with me?

BENTON: Yeah.

Det. Yung: So, what is that something?

BENTON: I don't know, I can't really explain it. Once I started it, I couldn't stop myself.

Det. Yung: So, is there a sexual attraction to younger girls?

BENTON: No, well I guess yes if you say that, but would I physically touch one if I saw them now? No, I wouldn't.

Det. Yung: Would you say it started off as curiosity?

BENTON: Yeah.

Det. Yung: And then?

BENTON: It then started.

---

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



Det. Yung: Started growing and got of hand?

BENTON: Yeah, it got out of hand.

Det. Yung: See, I have heard it before. There is nothing to be ashamed of, it's just trying to figure out what path you took. Before 2022, did you see any child pornography?

BENTON: No.

Det. Yung: At what point of 2022, did you come across it for the first time?

BENTON: That's the thing, I never came across child pornography until I had the Telegram app. I had Telegram since the fall of 2021. But I didn't want to date a younger girl. I did that I guess you could say when I was 17. So, when I was 17, I was talking to a freshman when I was 17, a senior in high school, but child pornography never led to that. I just found the girl attractive, she was very pretty. Child pornography never led me to talking to the freshman or anything like that.

Det. Yung: How did you go from a 3-4-year age gap to almost a 10-year age gap on Omegle?

BENTON: Telegram had a part of it. I had curiosity and I saw it and then I was like it might be on Omegle.

Det. Yung: So, you first saw it on Telegram?

BENTON: Yeah.

Det. Yung: And then you were seeking out girls that age on Omegle?

BENTON: I wasn't seeking that out but if it happened.

Det. Yung: How did you get them to go along with what you wanted?

BENTON: I just asked them if you are a boy or girl. They would say girl, then I would ask them if they wanted to have fun with a wink face. Then they would send it back, knowing what that is.

Det. Yung: And these are younger kids?

BENTON: Yeah.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT                                                                 Page 12 of 24

Det. Yung: At any point did you stop them when you realized where it is was going or did you continue?

BENTON: I continued.

Det. Yung: I would assume you were masturbating in front of them?

BENTON: Yeah.

Det. Yung: Did you finish on camera?

BENTON: Yeah.

Det. Yung: How often did you screen record that?

BENTON: Quite a few times, almost every time if something actually happened.

Det. Yung: Were you working off your cell phone or a laptop?

BENTON: My cell phone.

Det. Yung: And that's where that safe app or what did you call it?

BENTON: Keepsafe.

Det. Yung: That's where that came from?

BENTON: Yeah, I have always had the app, but had pictures of girls I dated who are my age.

Det. Yung: But then once things.

BENTON: I just transferred over to that.

Det. Yung: In the 3 years on Omegle, give me a percentage of age range breakdown that you were communicating with?

BENTON: Percentage?

Det. Yung: Yeah, how many would you say were under the age of 10?

BENTON: 45 maybe 40.

Det. Yung: 10 to 13?

| Current Case Title | ROI Number | Date Approved |
| --- | --- | --- |
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT                                                        Page 13 of 24

BENTON: Roughly the same, 40 percent, 50.

Det. Yung: 14 to 15?

BENTON: 50 to 60ish.

Det. Yung: Your age? Late teen to your age?

BENTON: I would say 35 to 40.

Det. Yung: It doesn't really add, so it sounds like the majority is going to be 14 and under. And half is going to be under 10 and the other half is going to be pre-teen to pubescent age, right?

BENTON: Yup.

Det. Yung: Then the lower percentage is going to be age appropriate, correct?

BENTON: Yeah.

Det. Yung: If you could connect with anybody around the world, why were you connecting with the lower age group so often? You were in control, correct?

BENTON: Yeah.

Det. Yung: My professional assessment would be that there is a little bit more than curiosity at that point.

BENTON: Yeah.

Det. Yung: Curiosity would be a handful of times, but if you are going to be that high percentage of who you are communicating with on Omegle, where you can communicate with anybody, there is a little more than just curiosity.

BENTON: Yeah, I see, yes sir.

Det. Yung: So, tell me what it is that's in there?

BENTON: I don't know, I don't know, I just never.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT                                                                 Page 14 of 24

Det. Yung: There is another side to our job than just arresting people. There is a side of helping people, and to offer help there is different resources available because of different age groups. I am trying to gain a better understanding of what attracts you to the 10 and under.

BENTON: I don't know.

Det. Yung: Is it the body? The innocence? The control?

BENTON: I honestly don't know. It's like once I started, I couldn't stop myself. I wanted to, but I don't know why I couldn't. I am not proud of it obviously. I regret it. I wouldn't be able to tell you why I continued to pursue it or what made me attracted to it.

Det. Yung: I think it goes back to there is some type of attraction to children. You might not accept it or are ashamed of it, but I think that's the underlying reason why you went back and for so long.

Det. Yung: In this time frame, how often were you watching pornography in general?

BENTON: Quite some time.

Det. Yung: How times per day?

BENTON: Two or three times.

Det. Yung: Each time were you masturbating?

BENTON: Yeah.

Det. Yung: How often would you intertwine that adult material and the children? Where you might be starting off with the adult and finishing off with the children?

BENTON: I start and finish with adult if I am on that. I don't switch it over.

Det. Yung: Basically, what you are watching, you are sticking with?

Det. Yung: Was it a picture or video that you first saw?

BENTON: It was a picture on Telegram. Dude was advertising it.

Det. Yung: Was it a little boy or girl?

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT                                                  Page 15 of 24

```
BENTON: Girl.

Det. Yung: What was she doing in that picture?

BENTON: Giving oral sex to a man.

Det. Yung: How did you feel after seeing that?

BENTON: I felt disgusted with myself.

Det. Yung: But then there was a shock of wow, that is actually out there?

BENTON: Yeah.

Det. Yung: And then how soon after did you see the second?

BENTON: The second was the next day.

Det. Yung: How many pictures or videos before you were pulled in?

BENTON: I think it was the third time, because he kept advertising it at first, and I would
ignore it. And then I kept seeing it.

Det. Yung: Then after that, you made contact with him?

BENTON: Yeah, the guy.

Det. Yung: Through Telegram?

BENTON: Yeah.

Det. Yung: Where was he sending the links through?

BENTON: Through a mega link.

Det. Yung: How did you verify yourself to him?

BENTON: I didn't verify myself. I just put my PayPal information in.

Det. Yung: So, you were just buying it straight off of him?

BENTON: Yeah.

Det. Yung: How much was he charging?
```

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT

Page 16 of 24

BENTON: 50 something or 55 for 200.

Det. Yung: How were the advertisements?

BENTON: It was a small collage of everything.

Det. Yung: Kind of like a screenshot of different things?

BENTON: Basically. He basically said what you get. He had a list for this much, you get this.

Det. Yung: By the third time you bought a link?

BENTON: Yeah.

Det. Yung: How often were you buying?

BENTON: I bought twice.

Det. Yung: Where did you save all that to?

BENTON: I didn't save it. The mega link had an option to save, but I didn't have the space for it. So, I just watched it and once I was done, I got rid of it.

Det. Yung: Do you still have your mega account?

BENTON: I think I do. I am sure I have it, but think I deleted it.

Det. Yung: So, you bought two times?

BENTON: Yup.

Det. Yung: Remember the time frames?

BENTON: The November one and the second one was before then. Not quite sure when.

Det. Yung: You said you used PayPal?

BENTON: Yeah.

Det. Yung: Have you ever traded?

BENTON: No.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



---

Det. Yung: Have you ever sold?

BENTON: No.

Det. Yung: Has anyone ever reached out to you to ask for material?

BENTON: One did. I don't know what the exact name was, and I told him I don't have anything.

Det. Yung: What platform what that on?

BENTON: Telegram.

Det. Yung: Have you been on other groups where they are trading?

BENTON: No, sir.  Just Telegram.

Det. Yung: What's the youngest that you have seen?

BENTON: Six or seven.

Det. Yung: What's the youngest you have chatted with on Omegle?

BENTON: Around eight or nine.

Det. Yung: Did you masturbate in those?

BENTON: Yeah.

Det. Yung: Girls or boys?

BENTON: Girls.

Det. Yung: What are these girls saying when this is going on?

BENTON: Usually like, let me see it or oh wow. They don't really say much.

Det. Yung: Do you ever coach them to touch themselves or undress?

BENTON: Yeah, I just ask them to show me their butt. That's it.

Det. Yung: You never told them to touch themselves or pose or do abc?

BENTON: Maybe to bend over, but that's it.

---

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

---

04/10/2023 14:31 EDT                                                                                   Page 18 of 24

SA Bolsei: You mentioned the two purchases on Telegram, the second one being the November one we talked about earlier. And that was 50 videos?

BENTON: Yeah.

SA Bolsei: The first purchase, was it the same person? Same user?

BENTON: I think it was a different one.

SA Bolsei: What was the time or date of that one?

BENTON: It was before the November one, maybe September or October.

SA Bolsei: How many videos in that one?

BENTON: It was a mega link, so I think it was like 200.

SA Bolsei: The first one was a link they sent. How did you get the one in November?

BENTON: Same thing, a link.

SA Bolsei: It wasn't right in Telegram?

BENTON: He sent the link in Telegram.

SA Bolsei: The videos weren't posted right in the Telegram chat?

BENTON: A few of them were. He would send a few, but he would have a mega link that had everything.

SA Bolsei: Do you remember the username for the first purchase?

BENTON: I don't.

Det. Yung: Is your Telegram still active?

BENTON: I think I deleted it awhile back, not sure when.

Det. Yung: Why did you delete it?

BENTON: I didn't want to deal with it anymore.

Det. Yung: The guilt got to you?

---

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

---

04/10/2023 14:31 EDT                                                          Page 19 of 24

BENTON: Yeah.

Det. Yung: I think you are getting close to the point of needing more, where masturbating on video with a six- or seven-year-old isn't enough. How accurate is that statement?

BENTON: I wouldn't do anything more than that, I promise you. The only thing I have done is just doing it from afar. I have been around people. Been around children in my job. I didn't feel anything. I didn't have any fantasies.

Det. Yung: You brought up a good word, fantasy. Outside of being at work, do you have any fantasies of younger kids, girls?

BENTON: I guess the most I would do or done, is just go on Omegle. Or when I had the files from the two other things, is go on that. But not actually encounter one, no.

Det. Yung: How is your dating life today?

BENTON: It's good.

SA Bolsei: Do you have a girlfriend now?

BENTON: Yeah.

SA Bolsei: How old is she?

BENTON: 21.

SA Bolsei: When you are watching the videos and masturbating to them, do you picture yourself in that situation in real life?

BENTON: I just do it for the feel. It feels good. I don't picture myself doing that actually.

SA Bolsei: When was the last time you were on Omegle?

BENTON: Yesterday.

SA Bolsei: What happened yesterday?

BENTON: I was just going through and seeing who I could talk to.

Det. Yung: What age range did you masturbate to yesterday?

BENTON: I don't think I did. The one I talked to, I think she was 13 or 14.

---

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

#### OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT                                                                    Page 20 of 24

Det. Yung: Do you go into any other websites or apps that you could meet these girls?

BENTON: Young girls, no.

SA Bolsei: Do you still have these videos in the Keepsafe app?

BENTON: Yes sir.

Det. Yung: What's the passcode to it?

BENTON: 0929.

SA Bolsei: 0929 and that's for Keepsafe?

BENTON: Yeah.

SA Bolsei: What are we going to see in there? How many and what are they?

BENTON: Basically, the same thing I told you, the Omegle stuff.

Det. Yung: Three year's worth?

BENTON: Roughly.

Det. Yung: How often do you go on?

BENTON: Every few days.

Det. Yung: About three or four days a week?

BENTON: I would say that, maybe.

Det. Yung: About 12 times a month?

BENTON: Roughly, maybe less.

Det. Yung: 144 times a year multiplied out by three.

BENTON: I don't have thousands of videos worth, but like a couple hundred.

Det. Yung: So, you recorded about a quarter of it?

BENTON: Yeah.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

#### OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

---

04/10/2023 14:31 EDT

SA Bolsei: So, a couple hundred saved?

BENTON: Yeah.

SA Bolsei: A thousand or more than you were involved in that you didn't save?

BENTON: Yeah.

SA Bolsei: How are you taking these videos?

BENTON: Screen recording.

SA Bolsei: What is the average time of the videos? How long?

BENTON: Some like two minutes, three minutes, four minutes, it varies.

SA Bolsei: Of the videos on the Keepsafe app, what is the predominate age that are on there?

BENTON: 10 and up.

SA Bolsei: Is there going to be any under 10?

BENTON: Not that I know of, maybe the youngest is nine or eight.

SA Bolsei: Have you kept a separate hard drive?

BENTON: No, I don't have a hard drive.

Det. Yung: What kind of phone is it?

BENTON: iPhone 11.

Det. Yung: You never saved it to your iCloud?

BENTON: No.

Det. Yung: You never saved to your Gmail?

BENTON: No, just on Keepsafe.

SA Bolsei: Do you have a Drop Box account or anything?

BENTON: I do have a Drop Box account, but I never stored anything in there. Just a video of a girl that wasn't underage, an Instagram model.

---

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT                                                    Page 22 of 24

Det. Yung: Anything else that you can think of that can help us make better sense of everything?

BENTON: That's pretty much it, everything is on the Keepsafe app. The Omegle stuff is mainly what I have done, been doing. Beside the interaction with MV1, I haven't had any other attraction to other underage girls.

Det. Yung: Is there anything we can do to help clarify anything for you? Are you going to ask what happens next?

BENTON: Yeah.

Det. Yung: That would be forensics?

SA Bolsei: I know you said the laptop was a family laptop?

BENTON: Yup.

SA Bolsei: Am I going to find anything on the laptop?

BENTON: No, I haven't touched that laptop.

SA Bolsei: Is there a password for the laptop?

BENTON: I think it's Cowboys2022.

SA Bolsei: Who laptop is it predominately?

BENTON: My sister was going to take it.

SA Bolsei: But she hasn't yet?

BENTON: She was planning on taking it when we move.

SA Bolsei: If you used it, the computer guys are going to have to do a deep dive on it.

BENTON: I know, but it's not mine.

SA Bolsei: Are there different accounts on it?

BENTON: No.

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

SA Bolsei: We are going to have to take a look at it, but the intention is to get it back to your family as soon as possible.

SA Bolsei explained the next steps to BENTON regarding forensics, report writing, and presenting evidence to the attorney.

Det. Yung: Have you ever used hidden cameras?

BENTON: No.

Det. Yung: Have you ever recorded your sister?

BENTON: No, no, no.

Det. Yung: You would be surprised how many family members will record other family members.

BENTON: Like I said, that's the most I have done is go on Omegle and just repeatedly do it. That's obviously inexcusable. That's wrong, but I would never have sexual intercourse with any minor. That has never crossed my mind. I go to my job and see kids. I help them. It never crosses my mind, I don't see it like that.

SA Bolsei again explained the process moving forward and advised BENTON to continue living his life.

SA Bolsei: I am not telling you not to move to Georgia. You are not under arrest right now.

SA Bolsei: I know we talked before about having bad thoughts, suicidal thoughts, in your head. Feeling bad or ashamed. None of this stuff is worth that.

BENTON: Listen, I am not proud of what I did, it's a lot, but I will never resort to that. It's not who I am.

SA Bolsei: Like Dale said, there is two sides, one side is finding bad people and putting them in jail, the other side is helping people. Part of that is making sure you are ok. *(Agent's Note: Dale refers to Det. Yung).*

BENTON: I am, I just am so sorry. There have been moments where I am just, what am I doing? I have had many moments like that.

At approximately 0113 hours, the interview concluded. SA Bolsei and Detective Yung escorted BENTON to the PWC PD lobby, and BENTON then walked to his sister's car and departed the PWC PD.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



04/10/2023 14:31 EDT

```
The investigation continues.
```

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Anthony Benton (RGV Referral) | DC07QR23DC0014-011 | 3/27/2023 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.